# UNITED STATES DISTRICT COURT

# DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| Procaccianti Companies, Inc. and TPG Hotels & Resorts, Inc. | Civil Action No. |
| Plaintiffs, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| vs. | |
| Zurich American Insurance Company | |
| Defendant. | |

## COMPLAINT

Plaintiffs, Procaccianti Companies, Inc. and TPG Hotels & Resorts, Inc. (collectively referred to as "Procaccianti"), file this Complaint for damages and declaratory relief against Defendant Zurich American Insurance Company ("Zurich"), alleging the following:

## I.    INTRODUCTION

1.    This diversity action for declaratory judgment, breach of contract, and breach of the implied covenant of good faith and fair dealing arises out of coverage under an "all risks" commercial property insurance policy that Zurich sold to Procaccianti.

2.    Despite agreeing to cover Procaccianti for all risks of physical loss of or damage to covered property from any cause unless excluded, and Procaccianti's resulting loss of business income and extra expense, Zurich refuses to stand by the insurance policy that it wrote and sold and honor its contractual undertakings.  Instead, Zurich distorts the facts and contorts the law in denying Procaccianti's claim.  But even a strained reading of the policy's plain language cannot alter the broad "all risks" coverage it provides.  Zurich should be required to cover Procaccianti's losses.

## II.   PARTIES

3.     Procaccianti Companies, Inc. is a corporation organized under the laws of the State of Rhode Island with its principal place of business in Cranston, Rhode Island.

4.     TPG Hotels & Resorts, Inc. is a corporation organized under the laws of the State of Rhode Island with its principal place of business in Cranston, Rhode Island.

5.     Zurich is a corporation organized under the laws of the State of New York with its principal place of business in Schaumburg, Illinois.  Zurich is, among other things, in the business of insuring companies like Procaccianti.  Zurich is a foreign insurance corporation that conducts business within the State of Rhode Island.  Zurich may be served with process by serving its registered agent, Company Corporation Service, at 222 Jefferson Blvd, Suite 200, Warwick, RI 02888.

## III.   JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Procaccianti's principal place of business is in this District and a substantial portion of the events or omissions giving rise to Procaccianti's claims and losses occurred within this District.

## IV.   FACTUAL BACKGROUND

### A.     Procaccianti's Operations and Purchase of the Zurich Policy

8.     Procaccianti is a real estate transactions holding company.  It is one of the largest privately held owner/operators of hotels in the United States and is a vertically integrated alternative asset manager with a broad national platform, having owned, developed, managed or financed investment real estate in more than 130 cities across 31 states, from coast to coast.

9.      TPG is a wholly owned subsidiary of Procaccianti and is a fully accredited operator and developer of the industry's most respected brands including Accor, InterContinental, Hilton, Hyatt, Marriott, Starwood and Wyndham that together represent over 40 hotel flags.  With over 60 hotels and nearly 18,000 guestrooms currently under management coast to coast, TPG employs a national workforce of more than 10,000 highly skilled hospitality professionals and is recognized throughout the industry as a leader in performance, service, and quality.

10.      Zurich is an insurance company that sold an "all risks" insurance policy to Procaccianti, which provides coverage to Procaccianti for "direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property."[1] (*See* Policy No. ERP7234788-01 (the "Policy"), Exhibit A at COMPLAINT-00014, 66.)

11.      Procaccianti's insured locations, referred to as "location" and "Insured Location" in the Policy, are as specified in the "Schedule of Locations" and described in the Policy's definition of Insured Location. (Ex. A at COMPLAINT-00015; Schedule of Locations, Exhibit B.)  These locations are referred to herein as "Procaccianti Locations."

12.      The Policy contains two independent triggers of coverage: the Policy insures against "physical loss" of property and against "damage" to property.

13.      As used in the Policy, the term "physical loss" is separate, distinct, and has an independent meaning from the term "damage."

14.      The Policy does not define "direct."

15.      The Policy does not define "physical."

16.      The Policy does not define "physical loss."

---

[1] Terms appearing in bold font are defined terms in the Policy and are as they appear in the Policy.

17.     The Policy does not define "damage."

18.     The Policy does not define the phrase "direct physical loss or damage."

19.     When undefined, the phrase "direct physical loss or damage" is susceptible to more than one reasonable interpretation.

20.     When the undefined phrase "direct physical loss or damage" is susceptible to more than one reasonable interpretation, it should be construed against the drafter.

21.     The Policy also provides coverage to Procaccianti for Time Element loss for the necessary **Suspension** of Procaccianti's business activities due to direct physical loss of or damage to Property of the type insurable under the Policy caused by a **Covered Cause of Loss**. (Ex. A at COMPLAINT-00027.)

22.     **Suspension** is defined in the Policy as the "slowdown or cessation of" Procaccianti's business activities. (Ex. A at COMPLAINT-00066.)

23.     Coverage under the Policy applies to Procaccianti, as the First Named Insured, and to TPG, as a subsidiary of the First Named Insured. (Ex. A at COMPLAINT-00013.)

24.     The Zurich Policy provides up to $300 million limits of liability, subject to specified sublimits for certain coverages. (Ex. A at COMPLAINT-00013, 15-18.)

25.     The Policy has an effective term of April 1, 2019 to April 1, 2020. (Ex. A at COMPLAINT-00013.)

26.     In exchange for Zurich's agreement to take on Procaccianti's risk of loss, Procaccianti paid Zurich $1,762,806.28.

**B.**   **COVID-19 is a Deadly Communicable Disease That Causes Physical Loss and Damage to Property**

27.     COVID-19 is a deadly communicable disease that has already infected over 14 million people in the U.S. and caused more than 281,253 deaths.[2]  No vaccine for COVID-19 has been approved by the U.S. Food and Drug Administration to date.

28.     The World Health Organization (the "WHO") has declared the COVID-19 outbreak a pandemic, and President Trump has declared a nationwide emergency due to the public health emergency caused by the COVID-19 outbreak in the U.S.

29.     A pandemic, by definition, is "an epidemic occurring worldwide . . . ."[3]

30.     As a declared pandemic, COVID-19 is present globally, including at each Procaccianti Location.[4]

31.     The Centers for Disease Control and Prevention (the "CDC") estimates that infection rates for COVID-19 likely are at least ten (10) times higher than reported.[5]

32.     In addition, the CDC has estimated that approximately 40% of COVID-19 positive individuals remain asymptomatic.[6]

---

[2] CDC, *Cases in the U.S.* (https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html) (last visited Dec. 7, 2020).

[3] Heath Kelly*, The classical definition of a pandemic is not elusive*, 89 Bulletin of the World Health Organization 7, at 540-41 (2011) (https://www.who.int/bulletin/volumes/89/7/11-088815/en/#:~:text=A%20pandemic%20is%20defined%20as) (last visited Dec. 7, 2020).

[4] The omnipresence of COVID-19 as a pandemic is referred to herein as the "Pandemic."

[5] Erika Edwards, *CDC says COVID-19 cases in U.S. may be 10 times higher than reported*, NBC News (June 25, 2020) (https://www.nbcnews.com/health/health-news/cdc-says-covid-19-cases-u-s-may-be-10-n1232134) (last visited Dec. 7, 2020).

[6] Ellen Cranley, *40% of people infected with COVID-19 are asymptomatic, a new CDC estimate says*, Business Insider (Jul 12, 2020) (https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-asymptomatic-2020-7) (last visited Dec. 7, 2020).

33.     The incubation period for COVID-19, which is the time between exposure and the onset of symptoms, can be up to fourteen (14) days.[7]

34.     During the incubation period, or "pre-symptomatic" period, infected persons can be contagious, and disease transmission can occur before the infected person shows any symptoms or has any reason to believe he or she has become infected.[8]

35.     Pre-symptomatic persons carry the greatest viral-load (i.e., the amount of virus in a person's nose, throat, and lungs) among all infected persons,[9] meaning their ability to transmit COVID-19 is greater than symptomatic persons.[10]

36.     COVID-19 is spread by multiple modes of transmission.[11]

37.     These multiple modes of COVID-19 transmission include person-to-person, property-to-person and airborne transmission.[12]

---

[7] World Health Organization, *Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020) (https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2) (last visited Dec. 7, 2020).

[8] *Id.* ("In a small number of case reports and studies, pre-symptomatic transmission has been documented through contact tracing efforts and enhanced investigation of clusters of confirmed cases.  This is supported by data suggesting… that some people can test positive for COVID-19 could transmit the virus before significant symptoms develop.").

[9] Xi He, *et al.*, *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 Nature Medicine 672, 674 (Apr. 15, 2020) (https://www.nature.com/articles/s41591-020-0869-5) ("A total of 414 throat swabs were collected from these 94 patients, from symptom onset up to 32 days after onset. We detected high viral loads soon after symptom onset, which then gradually decreased towards the detection limit at about day 21. . . . Our analysis suggests that viral shedding may begin 5 to 6 days before the appearance of the first symptoms. After symptom onset, viral loads decreased monotonically, consistent with two recent studies.") (last visited Dec. 7, 2020).

[10] Lirong Zou, M.Sc., *et al.*, *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, The New England Journal of Medicine (Mar. 19, 2020) ("The viral load that was detected in the asymptomatic patient was similar to that in the symptomatic patients, which suggests the transmission potential of asymptomatic or minimally symptomatic patients.") (https://www.nejm.org/doi/full/10.1056/nejmc2001737) (last visited Dec. 7, 2020); Roman Wolfel, *et al.*, *Virological assessment of hospitalized patients with COVID-2019*, 581 Nature 465 (Apr. 1, 2020) (https://www.nature.com/articles/s41586-020-2196-x) (last visited Dec. 7, 2020).

[11] Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. ENGL. J. MED. (Mar. 17, 2020), (https://www.nejm.org/doi/full/10.1056/NEJMc2004973) (last visited Dec. 7, 2020).

[12] *Id.*

38.     COVID-19 spreads by person-to-person transmission when an uninfected person ingests droplets of the saliva or nasal discharge of an infected person.[13]

39.     COVID-19 spreads via airborne transmission.[14]  Airborne transmission of COVID-19 occurs in two general ways.[15]

40.     Clouds of droplets of saliva or nasal discharge of an infected person, which may be released by a cough, a sneeze, or loud speech, can linger in the air for a period of minutes to hours, and can be pulled into air circulation systems.[16]

41.     Airborne COVID-19 also spreads via aerosol transmission.[17]

42.     Aerosol transmission involves the airborne transmission of viral RNA in particles smaller than 50 microns (human hair is about 80 microns), and which do not settle onto surfaces like larger droplets emitted through saliva and nasal discharge.[18]  Aerosol transmission typically involves viral RNA emitted through exhaled breath.[19]

---

[13] World Health Organization, *How does COVID-19 spread between people?*, (https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/coronavirus-disease-covid-19-how-is-it-transmitted) (last visited Dec. 7, 2020).

[14] Doremalen, *supra* n.11.

[15] CDC, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission* (last updated Oct. 5, 2020), (https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html) (last visited Dec. 7, 2020).

[16] Ramon Padilla & Javiar Zarracina, *Coronavirus might spread much farther than 6 feet in the air. CDC says wear a mask in public.*, (last updated Sept. 21, 2020) (www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/) (last visited Dec. 7, 2020).

[17] Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, Time (Aug. 25, 2020) (https://time.com/5883081/covid-19-transmitted-aerosols/) (last visited Nov. 18, 2020); Pien Huang, *Researchers Say Fresh Air Can Prevent Aerosol Transmission Of The Coronavirus*, NPR (Sep. 7, 2020) (https://www.npr.org/2020/09/07/910499236/researchers-say-fresh-air-can-prevent-aerosol-transmission-of-the-coronavirus) (last visited Nov. 18, 2020).

[18] *Id.* ("'Aerosol' (sometimes referred to as 'airborne') transmission is similar to droplet transmission, except that the bits of fluid are so small that they can linger in the air for minutes to hours. To understand the scale of aerosols, the diameter of a human hair is about 80 microns, and aerosols smaller than about 50 microns can float in the air long enough to be inhaled. SARS-CoV-2 is only 0.1 microns in diameter, so there is room for plenty of viruses in aerosols.").

[19] Padilla, *supra* n.16 ("'You cannot separate out droplet and fine aerosol emissions in everyday activities like talking, breathing and laughing.' Many scientists believe droplets and aerosols are on a continuum of sizes. 'So if

43.     Viral RNA contained in aerosol form can be circulated through a room via air circulation systems or natural air circulation.[20]

44.     The CDC published a study in July 2020 concluding that droplets circulating via a restaurant's ventilation system caused a COVID-19 outbreak among people who dined in the same restaurant, even though they were not seated together.[21]

45.     Medical researchers have advised that HEPA and other specialized air filtration systems can be used to remediate the presence of COVID-19.[22]  In other words, physical alteration of property may be necessary to render it safe from COVID-19 and return the property to a safe and useable state.

46.     COVID-19 also spreads by property- or surface-to-person transmission, where an uninfected person touches an object or surface that has come into contact with the saliva or nasal discharge of an infected person, and the uninfected person then touches his or her eyes, nose, or mouth.[23]

---

they accept that droplet transmission is happening they cannot exclude any contribution from aerosols.'"); Wenzhao Chen, *et al.*, *Short-range airborne route dominates exposure of respiratory infection during close contact*, ScienceDirect, vol. 176 (June 2020) (https://www.sciencedirect.com/science/article/abs/pii/S0360132320302183) (last visited Dec. 7, 2020) (Abstract) ("The short-range airborne route is found to dominate at most distances studied during both talking and coughing.").

[20] Jianyun Lu and Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 Emerging Infectious Diseases 11 (Sep. 11, 2020) (https://wwwnc.cdc.gov/eid/article/26/11/20-3774_article#suggestedcitation) (last visited Dec. 7, 2020) ("We conclude that the air conditioner prompted transmission of SARS-CoV-2; the customers in the airflow were at high risk for infection with SARS-CoV-2 in the poorly ventilated environment. Because the staff and other diners were not exposed to the airflow mixed with SARS-CoV-2 transmitted by patient A1, their risk for infection was lower.").

[21] Jianyun Lu, *et al.*, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020*, 26 Emerging Infectious Diseases 7 (July 2020) (https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article) (last visited Dec. 7, 2020).

[22] Zeynep Tufeckci, *We Need to Talk About Ventilation*, The Atlantic (July 30, 2020) (https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairborne-transmission/614737/) (last visited Dec. 7, 2020).

[23] *Id.*

47.     *The New England Journal of Medicine* study's results suggest that individuals could become infected with COVID-19 through indirect contact with surfaces or objects used by an infected person, whether they were symptomatic or not.[24]

48.     Surfaces, once physically affected by COVID-19, are referred to as fomites.[25]

49.     Fomites consist of both porous and nonporous surfaces or objects that can become contaminated with a virus and serve as vehicles in transmission.[26]

50.     Fomites become infected with virus by direct physical contact with body secretions or fluids, contact with soiled hands, contact with aerosolized virus (large droplet spread) released while talking, sneezing, coughing, or vomiting, or contact with airborne virus that settles after disturbance of an infected fomite (*e.g*., opening theatre curtains ).[27]

51.     Once a fomite is contaminated, the transfer of infectious virus may readily occur between inanimate and animate objects, or vice versa, and between two separate fomites.[28]

52.     Infection of frequently touched surfaces is, therefore, a potential source of viral transmission.[29]

---

[24] National Institutes of Health, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020) (https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces) (last visited Dec. 7, 2020); Doremalen, *supra* n.11.

[25] Stephanie A. Boone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, American Society for Microbiology (Mar. 13, 2007) (https://aem.asm.org/content/73/6/1687) (last visited Dec. 7, 2020).

[26] *Id*.

[27] *Id*.

[28] *Id*.

[29] *Id.*

53.    *The New England Journal of Medicine* has reported that SARS-CoV-2 was detectable in aerosols for up to three hours, up to four hours on copper, up to twenty-four hours on cardboard, and up to three days on plastic and stainless steel.[30]

54.    The CDC has reported that the virus can remain on polystyrene plastic, aluminum, and glass for eight days at the humidity recommended for indoor living spaces.[31]

55.    Another scientific study documented in the *Journal of Hospital Infection* found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces at room temperature for up to nine days.[32]

56.    All of these materials are used by Procaccianti throughout its facilities and operations.

57.    A study by the *Virology Journal* showed stable COVID-19 can survive on surfaces up to 28 days, serving as a vehicle for viral transmission during that time span.[33]

58.    As a global pandemic, the presence of COVID-19 is, by definition, worldwide.

59.    The ubiquitous presence of COVID-19 also is confirmed by statistics.

60.    Because COVID-19 is a pandemic and is statistically certain to be carried by a number of individuals who visit Procaccianti Locations daily, COVID-19 is continually reintroduced to the air and surfaces of Procaccianti Locations. [34]

---

[30] National Institutes of Health, *supra* n.24.

[31] Boris Pastorino, *et al.*, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 Emerging Infectious Diseases 9 (Sep. 2020) (https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article) (last visited Dec. 7, 2020).

[32] G. Kampf, *et al.*, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, 104 Journal of Hospital Infection 246-51 (Jan. 31, 2020) (https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3) (last visited Dec. 7, 2020).

[33] Shane Riddell, *et al.*, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, VIROLOGY J. (Oct. 7, 2020), (https://doi.org/10.1186/s12985-020-01418-7) (last visited Dec. 7, 2020).

[34] Terms appearing in bold font are defined terms in the Policy and are as they appear in the Policy.

61.     The presence of COVID-19 on property, including indoor air and surfaces, causes a tangible, physical transformation of the property.  It changes the property, including air and the surfaces into dangerous transmission mechanisms for the disease, rendering the affected property unsafe, unfit and uninhabitable for ordinary functional use.

62.     Under normal operating conditions, there is no effective way to repair or remediate the loss or damage caused by COVID-19 to commercial properties like the Procaccianti Locations because continued use of that property results in continual reintroduction of COVID-19 to the property.

63.     Short of complete closure of the Locations, implementation of strict administrative and operational controls that limit the number of persons at a Location are the only effective ways to repair or remediate the loss or damage caused by COVID-19 and protect against further loss or damage from COVID-19.

64.     The presence of COVID-19 on property, including Procaccianti's property, therefore, caused and continues to cause physical loss and/or damage to Procaccianti's property.

65.     The presence of COVID-19 also caused and continues to cause physical loss and/or damage by rendering Procaccianti's property hazardous and unsafe to human health, thereby depriving Procaccianti of the functionality and reliability of its property.

66.     This physical loss and/or damage to property, including Procaccianti's property, has required Procaccianti to close Procaccianti Locations, incur extra expense, adopt remedial and precautionary measures to restore and remediate the air and surfaces at Procaccianti Locations, and limit or cease operations across all Procaccianti Locations.

67.     Beginning in or around February 2020, COVID-19 caused tangible alteration to Procaccianti Locations and property that Procaccianti depends upon to conduct its normal business operations.

68.     Given the absence of commercially-available tests for surface and aerosol presence of COVID-19 and the shortage of testing kits for humans, however, positive human test results are not and cannot be the only means of proving the presence of COVID-19.

69.     In addition, numerous Procaccianti employees exhibited signs or actual symptoms of COVID-19, or tested positive for COVID-19, in 2020.  For example, since January 2020 to the date of this filing, Procaccianti employees recorded a combined total of more than 50,000 sick hours.

70.     During the same period, Procaccianti Locations had registered guests from all over the world.

71.     Even without actual detection, COVID-19 also is statistically certain to be present at Procaccianti Locations.  Statistical modeling also confirms that COVID-19 was and continues to be present at Procaccianti Locations.[35]

72.     Positivity rates, which are material to statistical modeling, measure saturation of COVID-19 in a particular locale.  Among other things, positivity rates are used to determine the statistical likelihood that at least one COVID-19 positive person will enter a facility.  Positivity rates are an indicator of the ubiquitous presence of COVID-19.[36]

---

[35] *COVID-19 Event Risk Assessment Planning Tool*, Georgia Institute of Technology (https://covid19risk.biosci.gatech.edu/) (last visited Dec. 7, 2020).

[36] David Dowdy and Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive"*, Johns Hopkins Bloomberg School of Public Health (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html (last visited Dec. 7, 2020).

73.     The WHO recommends that a particular area reach a positivity rate of 5.00% or lower before reopening.[37]

74.     As of this filing, Johns Hopkins University calculates 46 states to have a positivity rate that is above 5.00%.[38]

### C.     Governmental Orders Because of COVID-19 and Related Physical Loss or Damage to Property

75.     As a consequence of the physical loss and damage caused by COVID-19, and in an effort to slow the spread of COVID-19, federal, state and local governments imposed unprecedented directives through governmental orders (the "Governmental Orders") prohibiting travel to and within the United States, requiring certain businesses to close, and requiring residents to remain in their homes unless performing "essential" activities.  Excerpts from representative Governmental Orders are attached as Exhibit C.

76.     The Governmental Orders have limited, restricted, or prohibited partial or total access to Procaccianti Locations by, among other things, (a) requiring businesses deemed "non-essential" to close; (b) requiring businesses, after reopening, to make tangible alterations to their property and operations; and (c) requiring businesses, after reopening, to restrict customers from patronizing those businesses.

77.     Procaccianti Locations were damaged by stringent requirements of the Government Orders to the same extent they were damaged from COVID-19 and the Pandemic as the Locations were unusable.

---

[37] *See* Johns Hopkins University & Medicine, *WHICH U.S. STATES MEET WHO RECOMMENDED TESTING CRITERIA?*, (https://coronavirus.jhu.edu/testing/testing-positivity) (last visited Dec. 7, 2020).

[38] *Id.*

78.     The Government Orders were issued because of physical loss and/or damage to property caused by the presence of COVID-19 and the Pandemic.

79.     The Governmental Orders also were issued because of the physical loss and/or damage to property that was caused by and continues to be an imminent risk of harm from the presence and spread of COVID-19 and, in particular, the transmission of the virus through human contact with affected property.  *See supra*, ¶¶ 46-52.

80.     The Governmental Orders also were issued because, among other things, COVID-19 causes physical loss and/or damage to property due to its ability to attach to surfaces for prolonged periods, remain viable in indoor air, and render property unsafe for normal use.  *See supra*, ¶¶ 36-57.

81.     The Governmental Orders also were issued because, among other things, COVID-19 causes loss of functionality and/or reliability of property by transforming air and surfaces into dangerous and potentially deadly instrumentalities.

82.     Numerous Governmental Orders remain in effect and continue to require the suspension of business operations for non-essential businesses.

83.     As a business that relies on materials and customers from next door, to across the country and around the world, Procaccianti is subject to and has been adversely affected by these various Governmental Orders.

84.     The Governmental Orders, the damage caused by COVID-19, the Pandemic and the transmission of COVID-19 have had a devastating effect on Procaccianti's business.

85.     As a result of COVID-19, the Pandemic, and the Governmental Orders, Procaccianti was required to implement the use of personal protective equipment (PPE) and other administrative and operational controls at Procaccianti Locations.  These controls entail,

among other things, physical alterations to insured property to repair and remediate the damage caused by COVID-19 and mitigate further damage, resulting in a limitation on business operations at Procaccianti Locations.

86.     Persons infected with COVID-19 were present at Procaccianti Locations prior to the closures of Procaccianti Locations beginning in or around February 2020.

87.     Even with the reopening and loosening of restrictions in certain jurisdictions, Procaccianti's operations have not yet returned to pre-loss levels.

88.     In some jurisdictions, new Governmental Orders restricting or closing businesses have been issued as a result of a resurgence in COVID-19 cases after reopening for only a short period of time.  Some states have begun to re-implement tighter restrictions and have required businesses to close again after uncontrollable spread of COVID-19 and surges of COVID-19 cases and deaths.

**D.     The "All Risks" Coverage Is Triggered**

89.     The "All Risks" Coverage that Zurich sold to Procaccianti covers "direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property." (Ex. A at COMPLAINT-00014.)

90.     Zurich drafted the Policy.

**1.     COVID-19 Has Caused Damage to Procaccianti's Property, Triggering Coverage under the "All Risks" Policy**

91.     The presence of COVID-19 has caused and continues to cause actual physical loss and damage of the type insured under the Policy to insured property.  The presence of COVID-19 at Procaccianti Locations has therefore triggered coverage under the Policy.

92.     The presence of COVID-19 has caused and continues to cause actual physical loss and damage of the type insured under the Policy to property away from Procaccianti Locations.

The presence of COVID-19 at property away from Procaccianti Locations has cause a **Suspension** of Procaccianti's operations and has therefore triggered coverage under the Policy.

93.     Procaccianti has submitted a claim pursuant to the Policy as a result of sustaining losses covered by the Policy.  Notwithstanding, Zurich denied, or effectively denied, coverage for Procaccianti's claim and did so in bad faith without proper investigation and based on an apparent systematic company practice designed to minimize payments for covered COVID-19 claims.

**2.     Multiple Coverages Are Triggered under the "All Risks" Policy**

94.     In addition to triggering the Policy's "all risks" coverage, Procaccianti's claim also triggers multiple additional coverages under the Policy, including, but not limited to, the following:

**a.     *COVID-19 Triggered the Policy's Gross Earnings Coverage***

95.     The Policy covers Gross Earnings loss, which it defines as "the actual loss sustained by [Procaccianti] during the Period of Liability," resulting from the necessary **Suspension** of business activities at an Insured Location due to direct physical loss of or damage to Property of the type insurable under the Policy caused by a **Covered Cause of Loss** at the Insured Location. (Ex. A at COMPLAINT-00027-28.)

96.     Procaccianti has experienced, and continues to experience, Gross Earnings loss due to the necessary **Suspension** of its business activities due to direct physical loss of or damage to Property of the type insurable under the Policy caused by COVID-19 at Insured Locations, thereby triggering coverage under the Policy's Gross Earnings loss coverage.

**b.     *COVID-19 Triggered the Policy's Extra Expense Coverage***

97.     COVID-19 has caused Procaccianti to incur reasonable and necessary expenses to continue as close to normal as possible the conduct of Procaccianti's business.  Such expenses

16

are beyond those that Procaccianti would have normally incurred in conducting its business absent the presence of COVID-19.

98.    The expenses incurred by Procaccianti beyond those necessary in the normal operation of its business, solely as a result of the physical loss and damage caused by COVID-19, trigger coverage under the Policy's Extra Expense coverage.

### c.    *COVID-19 Triggered the Policy's Civil or Military Authority Coverage*

99.    The physical damage caused by the presence of COVID-19 at property located within five (5) statute miles of Procaccianti Locations has directly resulted in the issuance of the Governmental Orders prohibiting access to Procaccianti Locations.

100.    Procaccianti has sustained and will continue to sustain Time Element losses because orders from civil authorities, issued as a direct result of physical damage of the type insured at a Procaccianti Location or within five (5) statute miles of such a Procaccianti Location, have prohibited access to Procaccianti Locations.

101.    These Governmental Orders were issued as a direct result of physical damage to property from COVID-19, which is damage of the type insured, at a Procaccianti Location and/or within five (5) statute miles of a Procaccianti Location.

### d.    *COVID-19 Triggered the Policy's Contingent Time Element Coverage*

102.    The actual presence of COVID-19 at **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and/or **Attraction Properties** has caused physical damage to property at those **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element Locations**, and/or **Attraction Properties** resulting in actual loss and extra expense to Procaccianti, thereby triggering coverage under the Policy's Contingent Time Element coverage.

103.    Upon information and belief, the actual presence of COVID-19 continues to exist

at those **Direct Dependent Time Element Locations**, **Indirect Dependent Time Element**

**Locations**, and/or **Attraction Properties**.  For example:

a.  Boca Raton, Florida:  Florida Atlantic University, which is within one mile of Renaissance Boca Raton Hotel, 2000 NW 19 St., Boca Raton, FL 33241, has had 41 students and 1 employee test positive for COVID-19 as of September 9, 2020.[39]

b.  Lexington, Kentucky:  University of Kentucky, which is located within one mile of Hyatt Regency Lexington, 401 W High St., Lexington KY 40507, has had 2,378 students test positive for COVID-19 as of November 24, 2020.[40]

c.  Providence, Rhode Island:  Rhode Island Hospital, which is located within one mile from Hilton Providence, 21 Atwells Ave., Providence, RI, 02902, on November 30, 2020, used an Emergency Alert System to inform Rhode Islanders that hospitals were at capacity due to COVID-19.[41]

d.  Atlanta, Georgia:  Northside Hospital Atlanta, which is located within one mile from Hilton Atlanta Perimeter Suites, 6120 Peachtree Dunwoody Rd., Atlanta, GA 30328, on December 2, 2020, reported a 100% increase in total COVID-19 patients over the prior month.[42]

e.    ***COVID-19 Triggered the Policy's Ingress/Egress Coverage***

104.    COVID-19, and the physical loss and damage it has caused, have resulted in the

necessary **Suspension** of Procaccianti's business activities at Procaccianti Locations by totally or

---

[39] Zachary Weinberger, *FAU reports 42 positive COVID-19 cases in new system that updates every 30 minutes*, University Press (Sept. 9, 2020) (https://www.upressonline.com/2020/09/fau-reports-42-positive-covid-19-cases-in-new-system-that-updates-every-30-minutes/) (last visited Dec. 7, 2020).

[40] University of Kentucky, COVID-19 Data Dashboard (last updated Nov. 24, 2020) (https://www.uky.edu/coronavirus/covid-19-data-dashboard).

[41] *Rhode Island sends alert: 'Hospitals at capacity due to COVID'*, BOSTON.COM (Nov. 30, 2020) (https://www.boston.com/news/coronavirus/2020/11/30/rhode-island-sends-alert-hospitals-at-capacity-due-to-covid); Jack Perry, *Rhode Island hospitals are full. Covid field hospital opening today*, THE PROVIDENCE JOURNAL (Nov. 30, 2020) (https://www.providencejournal.com/story/news/healthcare/2020/11/30/covid-field-hospital-cranston-begin-accepting-patients-monday/6461763002/).

[42] Andy Miller, *Many Hospitals Report Rise in COVID Patients, Fear Post-Holiday Surge*, GA TODAY (Dec. 2, 2020) (https://www.gpb.org/news/2020/12/02/many-hospitals-report-rise-in-covid-patients-fear-post-holiday-surge) ("The Atlanta-based Northside system has seen a 100 percent increase in total COVID-19 patients over the past month.").

partially preventing ingress to or egress to and from Procaccianti Locations and/or to property within five (5) miles of Procaccianti Locations as a direct result of physical loss and damage to property, thereby triggering the Policy's Ingress/Egress coverage.

**f.    *COVID-19 Triggered the Policy's Protection and Preservation of Property Coverage***

105.    COVID-19 has threatened and continues to threaten to cause physical loss and damage to property.

106.    This actual and threatened physical loss and damage to insured property has prompted Procaccianti to take action to temporarily protect or preserve its property, thereby triggering the Policy's Protection and Preservation of Property coverage.

**3.    In the Alternative, the Policy is Ambiguous and Coverage is Triggered**

107.    The Policy unambiguously covers the losses claimed by Procaccianti. However, Zurich has refused to acknowledge that COVID-19, the Pandemic and/or the Governmental Orders constitute non-excluded **Causes of Loss** that have and will continue to cause direct physical loss of or damage to property.

108.    Notwithstanding Zurich's refusal, at least twenty-one courts have already concluded that COVID-19, the Pandemic and/or the Governmental Orders meet this requirement and are sufficient to trigger coverage for losses similar to Procaccianti's claimed loss and expense (Exhibit D).

(1) *JGB Vegas Retail Lessee, LLC v. Starr Surplus Lines Insurance Co.*, No. A-20-816628-B (Nev. Dist. Ct. Nov. 30, 2020) (denying insurer's motion to dismiss and stating that "[plaintiff's] complaint sufficiently alleges losses stemming from the direct physical loss and/or damage to property from COVID-19 to trigger [insurer's] obligations under the property and time element coverage provisions in the Policy, including coverage for general business interruption and Interruption by Civil or Military Authority.") (Ex. D, Tab 1, COMPLAINT-00183-COMPLAINT-00190)

(2) *Perry St. Brewing Co., LLC v. Mut. of Enumclaw Ins. Co.*, No. 20-2-02212-32 (Wash. Sup. Ct. Nov. 23, 2020) (granting summary judgment in favor of policyholder and holding that business interruption as a result of closure orders constituted a direct physical loss covered by the policy; "the Court concludes as a matter of law that [the plaintiff] suffered a loss of its property at premises when [the plaintiff] lost the ability to use its property at premises for its intended purpose."). (Ex. D, Tab 2, COMPLAINT-00191-COMPLAINT-00197)

(3) *Dino Palmieri Salons, Inc. v. State Auto. Mut. Ins. Co.*, No. CV-20-932117 (Ohio Ct. Co. Pl. Nov. 17, 2020) ("Here, not only do Plaintiffs allege that Covid-19—a physical substance—was likely on their premises, but that it was physically present and that it caused physical loss and damage. Accordingly, the Court finds that Plaintiffs have sufficiently alleged that Covid-19 existed on their premises, and that it caused direct physical loss and damage."). (Ex. D, Tab 3, COMPLAINT-00198-COMPLAINT-001210)

(4) *Hill & Stout PLLC v. Mut. of Enumclaw Ins. Co.*, No. 20-2-07925-1 (Wash. Sup. Ct. Nov. 13, 2020) ("The fact that both terms were included in the coverage provision shows that the drafters of the Policy meant the term 'physical loss of' to mean something other than 'damage to'… The Court therefore finds that the phrase 'physical loss of' is ambiguous because it is fairly susceptible to two reasonable interpretations and dismissal under CR 12(b)(6) is not appropriate."). (Ex. D, Tab 4, COMPLAINT-00211-COMPLAINT-00216)

(5) *Independence Barbershop, LLC v. Twin City Fire Ins. Co.*, No. 1:20-cv-00555, 2020 WL 6572428 (W.D. Tex. Nov. 4, 2020) ("The Court holds that Plaintiff has plead a plausible claim for relief.").

(6) *Taps & Bourbon on Terrace LLC v. Underwriters at Lloyd's London*, No. 200700375 (Pa. Ct. Com. Pl. Oct. 26, 2020) (denying insurer's motion to dismiss, noting "the law and facts are rapidly evolving in the area of COVID-19 related business losses"). (Ex. D, Tab 5, COMPLAINT-00217-COMPLAINT-00218)

(7) *Chapparells Inc. v. Cincinnati Ins. Co.*, No. CV-2020-06-1704 (Ohio Ct. Com. Pl. Oct. 21, 2020) (summary order denying insurer's motion to dismiss). (Ex. D, Tab 6, COMPLAINT-00219-COMPLAINT-00222)

(8) *Lombardi's, Inc. v. Indem. Ins. Co. of N. Am.*, No. DC-20-05751 (Tex. State Ct. Oct. 15, 2020) (summary order denying insurer's motion to dismiss). (Ex. D, Tab 7, COMPLAINT-00223)

(9) *North State Deli, LLC v. Cincinnati Ins. Co.*, No. 20-CVS-02569 (N.C. Sup. Ct. Oct. 7, 2020) ("'[D]irect physical loss' describes the scenario where

business owners and their employees, customers, vendors, suppliers, and others lose the full range of rights and advantages of using or accessing their business property. This is precisely the loss caused by the Government Orders. Plaintiffs were expressly forbidden by government decree from accessing and putting their property to use for the income-generating purposes for which the property was insured. These decrees resulted in the immediate loss of use and access without any intervening conditions. In ordinary terms, this loss is unambiguously a 'direct physical loss,' and the Policies afford coverage."). (Ex. D, Tab 8, COMPLAINT-00224-COMPLAINT-00232)

(10) *Best Rest Motel Inc. v. Sequoia Ins. Co.*, No. 37-2020-00015679-CU-IC-CTL (Cal. Sup. Ct. Sep. 30, 2020) (summary order denying insurer's motion to dismiss). (Ex. D, Tab 9, COMPLAINT-00233)

(11) *Francois Inc. v. Cincinnati Ins. Co.*, No. 20CV201416 (Ohio Ct. Com. Pl. Sep. 29, 2020) (summary order denying insurer's motion to dismiss). (Ex. D, Tab 10, COMPLAINT-00234)

(12) *Urogynecology Specialist of Fla. LLC v Sentinel Ins. Co., Ltd.*, No. 6:20-cv-01174-ACC-EJK, 2020 WL 5939172 (M.D. Fla. Sep. 24, 2020) (denying insurer's motion to dismiss due to ambiguity of the policy's virus exclusion).

(13) *Johnston Jewelers Inc. v. Jewelers Mut. Ins. Co.*, S.I., No. 20-002221-CI (Fla. Cir. Ct. Sep. 22, 2020) (summary order denying insurer's motion to dismiss). (Ex. D, Tab 11, COMPLAINT-00235)

(14) *Blue Springs Dental Care LLC v. Owners Ins. Co.*, No. 4:20-cv-00383-SRB, 2020 WL 5637963 (W.D. Mo. Sep. 21, 2020) ("Here, Plaintiffs allege that 'it is likely customers, employees, and/or other visitors to the insured properties over the recent month were infected with the coronavirus,' they 'suspended operations due to COVID-19 to prevent physical damages to the premises by the presence or proliferation of the virus and the physical harm it could cause persons present there,' and that 'customers cannot access the property due to the Stay at Home Orders or fear of being infected with or spreading COVID-19.' Plaintiffs also explain how COVID-19 is physically transmitted by air and surfaces through droplets, aerosols, and fomites that remain infectious for extended periods of time. Taking Plaintiffs' fact allegations as true, as the Court must at this stage, and after drawing reasonable inferences from those facts in their favor, Plaintiffs plausibly allege that COVID-19 physically attached itself to their dental clinics, thereby depriving them of the possession and use of those insured properties.").

(15) *SSF II, Inc. v. Cincinnati Ins. Co.*, No. 20CV002644 (Ohio Ct. Com. Pl. Sep. 8, 2020) (summary order denying insurer's motion to dismiss). (Ex. D, Tab 12, COMPLAINT-00236- COMPLAINT-00238)

(16) *780 Short North LLC v. Cincinnati Ins. Co.*, No. 20CV003836 (Ohio Ct. Com. Pl. Sep. 8, 2020) (summary order denying insurer's motion to dismiss). (Ex. D, Tab 12, COMPLAINT-00236- COMPLAINT-00238)

(17) *Ridley Park Fitness LLC v. Philadelphia Ins. Cos.*, No. 200501093 (Pa. State Ct. Aug. 31, 2020) (summary order denying insurer's motion to dismiss as premature). (Ex. D, Tab 13, COMPLAINT-00239-COMPLAINT-00240)

(18) *Optical Services USA/JC1 v Franklin Mut. Ins. Co.*, No. BER-L-3681-20 (N.J. Sup. Ct. Aug. 13, 2020) (noting that there was no controlling legal authority to support the insurer's interpretation of the policy, and that there had been no discovery taken to guide the Court with respect to its decision on the motion to dismiss, and therefore "the plaintiff should be permitted to engage in issue-oriented discovery and also be permitted to amend its complaint accordingly prior to an adjudication on the merits of any policy language"). (Ex. D, Tab 13, COMPLAINT-00241- COMPLAINT-00274)

(19) *K.C. Hopps, Ltd. v. Cincinnati Ins. Co.*, No. 4:20-cv-00437, 2020 WL 6483108 (W.D. Mo. Aug. 12, 2020) ("For substantially the same reasons as those in the Studio 417 Order, the Court finds that Plaintiff's claims against Defendant are adequately stated.").

(20) *Somco, LLC v. Lightning Rod Mut. Ins. Co.*, No. CV-20-931763, 2020 WL 4692385 (Ohio Ct. Com. Pl. Aug. 12, 2020) (summary order denying insurer's motion to dismiss). (Exhibit 24.)

(21) *Studio 417, Inc. v. The Cincinnati Ins. Co.*, No. cv-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020) (denying insurer's motion to dismiss and finding that plaintiff's complaint alleged direct physical loss, because it alleged that the virus "is a physical substance," which "live[s] on" and is "active on inert physical surfaces," and that "it is likely that customers, employees, and/or other visitors to the insured properties were infected with COVID-19 and thereby infected the insured properties with the virus" and "the presence of COVID-19 'renders physical property in their vicinity unsafe and unusable'").

109. Thus, at worst for Procaccianti, the Policy is reasonably susceptible to multiple interpretations, which still requires a finding of coverage for Procaccianti's claimed losses.

110.    The *Studio 417* court specifically found that COVID-19, as a physical substance that can attach to and deprive a policyholder of its property by making it unusable, may constitute a "direct physical loss" based on the plain and ordinary meaning of the phrase.

111.    Similarly, the *JGB Vegas Retail Lessee* court held that the plaintiff's allegations regarding the physical presence and known facts about COVID-19, including that it spreads through infected droplets that "are physical objects that attach to and cause harm to other objects" based on its ability to "survive on surfaces" and then infect other people, was sufficient to allege that its losses stemmed from the direct physical loss and/or damage to property from COVID.

112.    In addition, the *North State Deli* court held that loss of physical use and access of a group of restaurants constituted "direct physical loss" that was covered by the insurance policy.

113.    The courts' holdings in *Studio 417*, *JGB Vegas Retail Lessee*, and *North State Deli* establishes that a reasonable reading of the phrase "direct physical loss" encompasses the risks of loss caused by COVID-19.

114.    Under Rhode Island law, policy language is considered ambiguous if it is susceptible to two or more reasonable interpretations. *Bliss Mine Rd. Condo. Ass'n v. Nationwide Prop. & Cas. Ins. Co.*, 11 A.3d 1078, 1083 (R.I. 2010) ("A contract, however, is ambiguous when it is 'reasonably susceptible of different constructions.'").

115.    Ambiguities are construed in favor of the insured. *Id*. ("When an ambiguity such as the one at issue here arises in an insurance contract, we construe the ambiguity strictly in favor of the insured.").

116.    The courts' holdings in Studio 417, JGB Vegas Retail Lessee, and North State Deli is *prima facie* evidence that Procaccianti's interpretation of the policy language, as alleged

herein, is reasonable, which requires a finding of coverage regardless of any alternative interpretation proffered by the Insurers even if such interpretations are also reasonable.

### 4.     No Exclusion in the Policy Affects Coverage for Procaccianti's Losses

117.    No exclusion in the Policy applies to preclude or limit coverage for the actual presence of COVID-19 at or away from Procaccianti Locations, the physical loss and damage to property at Procaccianti Locations, and/or the Time Element losses that have and will continue to result from the physical loss and damage to property.  To the extent Zurich contends that any exclusion applies, such exclusion is ambiguous and/or unenforceable.

### 5.     The Policy's "Contamination" Exclusion Does Not Apply

118.    The Policy contains an exclusion that purports to bar coverage for "Contamination," as that term is defined in the Policy.  (Ex. A at COMPLAINT-00024.)

119.    By Amendatory Endorsement, the Policy defines **Contamination** as "[a]ny condition of property due to the actual presence of any **Contaminant(s)**[,]" and defines **Contaminant(s)** as "[a]ny solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), or other hazardous substances, **Fungus** or **Spores**." (Ex. A at COMPLAINT-00101) (the "Amendatory Endorsement").

120.    The Amendatory Endorsement was drafted and added to the Policy by Zurich.

121.    By its terms, the Policy's "Contamination" exclusion applies only to traditional industrial pollution.

122.    Upon information and belief, at the time Zurich sold the Policy to Procaccianti, Zurich sold business interruption policies in North America that contain specific language excluding pandemics from coverage.

123.    The "Contamination" exclusion contains no terms that provide application of the exclusion to pandemic loss or damage caused by a communicable disease.

124.    Under Rhode Island law, it is not enough for Zurich to show that its interpretation of the "Contamination" exclusion is reasonable; Zurich must show that its interpretation is the *only* reasonable interpretation.  *Rhode Island Airport Corp., Inc. v. Gen. Star Indem. Co.*, No. CV 07-300 S, 2009 WL 10728627, at *4 (D.R.I. Feb. 9, 2009) ("Only when terms are subject to more than one reasonable interpretation is a policy construed in favor of the insured. . . . It is [the insured's] burden to show coverage exists, but [the insurer] must prove the exclusion applies.")

125.    Nor may the scope of an exclusionary provision be expanded by implication.  *See Cheaters, Inc. v. United Nat. Ins. Co*., 41 A.3d 637, 645 (R.I. 2012) (In our reading of the insurance policy at issue, we have been mindful of the principle that 'exclusion clauses do not grant coverage; rather, *they subtract from it*.'"); *Spurlin v. Merchants Ins. Co. of New Hampshire*, 57 F.3d 9, 11 (1st Cir. 1995) ("Nor do exclusions themselves create coverage.").

126.    The Amendatory Endorsement's definition of **Contamination** does not include the terms "virus," "disease causing or illness causing agent," "pathogen," "pandemic" or any other similar terms.  (Ex. A at COMPLAINT-00101.)

127.    Zurich's clear and deliberate choice to not include specific language in the Policy's Contamination exclusion excluding any pandemic or communicable disease must be construed against Zurich and in favor of Procaccianti.

128.    The Amendatory Endorsement conspicuously states "**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**."  (Ex. A at COMPLAINT-00102.)

129.    By its plain and conspicuous terms, the Amendatory Endorsement changes Policy provisions throughout the Policy.

130.    For example, the Amendatory Endorsement changes Policy provisions concerning cancellation and non-renewal, which apply to the Policy as a whole. (Ex. A at COMPLAINT-00099.)

131.    Likewise, the Amendatory Endorsement changes the Policy's General Conditions, which govern the Policy as a whole. (Ex. A at COMPLAINT-00099-101.)

132.    By its plain and conspicuous terms, the terms of the Amendatory Endorsement apply without any geographic limitation.

133.    The only geographic reference in the Amendatory Endorsement appears in the Amendatory Endorsement's title.

134.    The Amendatory Endorsement's title carries no meaning, per the plain and unambiguous terms of the Policy, which provides: "TITLES . . . The titles of the various paragraphs and endorsements are solely for reference *and shall not in any way affect the provisions to which they relate*." (Ex. A at COMPLAINT-00057) (emphasis added).

135.    Although the terms of the TITLES provision of the Policy clearly require that titles carry no meaning, to the extent the terms are unclear as to whether any geographical limitation applies to the Amendatory Endorsement, such ambiguity must be construed in favor of coverage and Procaccianti's reasonable expectation that the endorsement modifies the Policy without limitation.

E.    **Zurich's Bad Faith Conduct**

136.    Zurich breached the implied duty of good faith and fair dealing that is implied in every insurance policy by failing to conduct a fair and comprehensive investigation before refusing to pay Procaccianti's claim and by improperly refusing to pay Procaccianti's claim.

137.    After Procaccianti tendered its claim to Zurich on April 13, 2020, Zurich responded with a request for extensive and potentially voluminous information.

138.    Zurich had no intention of reasonably and fully adjusting this claim, as evidenced by the reservation of rights letter it provided to Procaccianti on June 22, 2020. (Exhibit E.)

139.    Zurich's June 22 letter repeatedly and incorrectly asserts that the presence of COVID-19 does not constitute direct physical loss or damage to property under the Policy. (Ex. E at COMPLAINT-00275-79.)

140.    Zurich prepared the June 22 letter without ever physically inspecting, testing or even observing any Procaccianti Location for the presence of COVID-19 or resulting direct physical loss or damage.

141.    Nor did Zurich ever request an opportunity to physically inspect, test or observe any Procaccianti Location following its receipt of Procaccianti's notice of loss.

142.    Nor did Zurich ever provide Procaccianti with direction or materials to test its property for the presence of COVID-19.

143.    The June 22 letter also contends, ignoring the plain terms of its own Policy and citing incorrect definitions of **Contamination** and **Contaminant**, that the Policy's Contamination Exclusion applies to the presence of COVID-19. (Ex. E at COMPLAINT-00276.)

144.    Nevertheless, instead of accepting or denying coverage, Zurich's June 22 letter only reserved rights under the Policy and requested still more information in addition to its prior request for information. (Ex. E at COMPLAINT-00279.)

145.    Zurich's requests for additional information were intended to delay providing a coverage position and/or to improperly shift the expense of Zurich's investigation to Procaccianti, which otherwise would be covered under the Policy.

146.    On August 12, 2020, Procaccianti provided a letter to Zurich disputing the positions taken in Zurich's June 22 letter, expressing the undue burden that responding to Zurich's improper request for additional information would exact on Procaccianti and requesting a definite coverage position from Zurich regarding the claim. (Exhibit F.)

147.    On August 17, 2020, instead of identifying which of the information it had requested was necessary to make its coverage decision, Zurich provided a letter to Procaccianti denying coverage for its claim based on substantially the same positions and Policy provisions that Zurich had reserved rights on in its June 22 letter. (Exhibit G.)

148.    Zurich's August 17 letter thus demonstrates that Zurich's request for information was part of its illusory investigation and served no other purpose than to delay providing a coverage decision for Procaccianti's claim.

149.    Zurich's denial of coverage also runs counter to its advertising of the Zurich Edge policy, which states that the Policy is "[w]ritten in easy-to-understand language and broadly customizable" and as "especially advantageous for customers with highly protected risk exposures."[43]

150.    Here, despite the express Policy language providing coverage for "all risks" not excluded, which unambiguously covers Procaccianti's claim, Zurich has refused to acknowledge its contractual obligation to provide coverage under the Policy for Procaccianti's claim.

151.    Zurich also advertises, in the section of its webpage titled, "What is Commercial Property Insurance?", that "[c]ommercial property insurance policies can also include vital

---

[43] Zurich, *What is Commercial Property Insurance?*, (https://www.zurichna.com/insurance/property#whyzurich) (last visited Dec. 7, 2020).

business interruption coverage features that will help you maintain your business income stream should a loss temporarily halt your operations."[44]

152.    However, although Procaccianti purchased such vital business interruption coverage from Zurich and has suffered, and continues to suffer, covered losses to its business income stream because of the temporary halt of its operations due to COVID-19, the Pandemic and/or the Governmental Orders, Zurich has refused to pay Procaccianti's claim.

153.    Zurich has improperly designed and implemented a generalized response to COVID-19 related claims that it would not provide coverage for any claims for losses due to COVID-19.

154.    In addition to the circumstances described above, Zurich published a statement on June 16, 2020, titled "Rewriting business interruption insurance contracts isn't a solution," stating strong opposition to any legislation that would provide business interruption relief to insureds in connection with COVID-19, stating that "[t]he insurance industry strongly opposes any proposals that retroactively rewrite insurance contracts and threaten the stability of the market."[45]

155.    Consistent with such position, Zurich also has repeatedly asserted conclusory statements in its June 22 and August 17, 2020 letters that COVID-19 does not constitute direct physical loss of or damage to property without providing any substantive reasoning or discussion as to how or why Zurich has reached such conclusion.

---

[44] *Id.*

[45] Lynne Grinsell, *Rewriting business interruption insurance contracts isn't a solution*, Zurich (June 16, 2020) (https://www.zurichna.com/knowledge/articles/2020/06/rewriting-business-interruption-insurance-contracts-isnt-a-solution) (last visited Dec. 7, 2020).

156.    Zurich was obligated under Rhode Island law to conduct a fair and comprehensive investigation of Procaccianti's claim _before_ Zurich refused to pay the claim.  Zurich cannot seek to justify its denial of Procaccianti's claim by gathering information which it should have had in the first instance.

157.    Zurich's intentional failure to conduct a fair and comprehensive investigation of Procaccianti's claim to determine whether there is a lawful basis to deny the claim, before Zurich refused to pay the claim, standing alone, constitutes tortious bad faith under Rhode Island law.

158.    In conducting any investigation, evaluation, and/or processing of Procaccianti's claim, Zurich acted unreasonably and knew or was conscious of the fact that its conduct was unreasonable.

159.    Additionally, Zurich's general view, which is not based on any particular claim or insurance policy, that business interruption coverage does not provide coverage for claims in connection with COVID-19 illustrates Zurich's lack of any reasonable investigation, and its intention not to conduct a reasonable investigation, into Procaccianti's claim and, instead, to summarily deny coverage for Procaccianti's claim.

160.    Zurich's bad faith is further illustrated by its violation of the Rhode Island Deceptive Trade Practice Laws, which declares unlawful any unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. 6 R.I. Gen. Laws § 6-13.1-2.

161.    Among the unfair methods of competition and unfair or deceptive acts or practices that Rhode Island law prohibits are as follows: "(ix) Advertising goods or services with intent not to sell them as advertised; . . . (xiii) Engaging in any act or practice that is unfair or

deceptive to the consumer; [and] . . . (xiv) Using any other methods, acts, or practices that

mislead or deceive members of the public in a material respect[.]" 6 R.I. Gen. Laws § 6-13.1-1.

162.    Zurich's illusory investigation and improper denial of coverage for Procaccianti's

claim constitute unfair methods of competition and unfair or deceptive acts or practices under the

Rhode Island Deceptive Trade Practice Laws.

163.    Zurich's bad faith investigation and denial of coverage are further illustrated by

its violation of certain Rhode Island insurance laws.

164.    For example, the Rhode Island Unfair Claims Settlement Practices Act (27 R.I.

Gen. Laws § 27-9.1-1, *et seq*.) prohibits insurers from engaging in unfair claims practices, which

include, among other things:

(1) Misrepresenting to claimants and insured relevant facts or policy provisions

relating to coverage at issue;

(2) Failing to acknowledge and act with reasonable promptness upon pertinent

communications with respect to claims arising under its policies;

(3) Failing to adopt and implement reasonable standards for the prompt

investigation and settlement of claims arising under its policies;

(4) Not attempting in good faith to effectuate prompt, fair, and equitable

settlement of claims submitted in which liability has become reasonably clear; . . .

(6) Refusing to pay claims without conducting a reasonable investigation;

(7) Failing to affirm or deny coverage of claims within a reasonable time after

having completed its investigation related to the claim or claims; . . .

(12) Failing in the case of claims denials or offers of compromise settlement to

promptly provide a reasonable and accurate explanation of the basis of those

actions; [and] . . .

(16) Failing to respond to a claim within thirty (30) days, unless the insured shall

agree to a longer period[.]

27 R.I. Gen. Laws § 27-9.1-4.

165.    Zurich's investigation and coverage response to Procaccianti's claim constitutes,

as a predicate act in violation of the Rhode Island Deceptive Trade Practice Laws, a violation of

under the Rhode Island Unfair Claims Settlement Practices Act (27 R.I. Gen. Laws § 27-9.1-1, *et*

*seq*.).

166.    Zurich's failure to diligently pursue a thorough, fair, and objective investigation

of Procaccianti's claim and improper denial of coverage constitutes a violation of the Rhode

Island Unfair Claims Settlement Practices Act, the Rhode Island Deceptive Trade Practice Laws,

and Rhode Island common law principles of good faith, which are implied in every insurance

contract.

167.    Procaccianti has sustained covered loss under the Policy and, accordingly,

submitted its claim to Zurich.

168.    Zurich has wrongfully refused to provide coverage for Procaccianti's claim in

breach of the Policy.

169.    Zurich has asserted the following coverage positions with respect to

Procaccianti's claim under the Policy: (i) there is no coverage under the Policy for this claim

because COVID-19 does not cause physical loss of or damage to property; and (ii) there is no

coverage under the Policy for this claim pursuant to the Policy's Contamination Exclusion.

These coverage positions are wrong and constitute a wrongful denial of coverage for Procaccianti and TPG's claim under the Policy.

170.    In denying Procaccianti's claim, Zurich has failed to faithfully apply the language of the Policy that it drafted, ignored longstanding principles of Rhode Island insurance law, ignored industry best practices, failed to conduct a reasonable investigation, and failed to consider the facts relevant to the claim against the language of the Policy as interpreted pursuant to Rhode Island law.

171.    Zurich's actions are contrary to the accepted practices of good faith insurance claim handling.

172.    Zurich's actions constitute an unfair or deceptive act or practice in the business of insurance.

173.    Zurich's actions reflect a conscious disregard of the policyholder's rights under the Policy.

174.    Zurich knowingly or recklessly failed to conduct a reasonable investigation of Procaccianti's claim and, therefore, the basis for Zurich's denial is unreasonable.

175.    In denying Procaccianti's claim, Zurich knew its denial lacked any reasonable basis.

176.    In denying Procaccianti's claim, Zurich failed to faithfully apply its own Policy language, failed to conduct a reasonable investigation, and failed to consider the facts relevant to Procaccianti's claim against the Policy language as interpreted by Rhode Island law.

177.    Because of Zurich's bad faith conduct, including its wrongful denial and inadequate claim investigation, Procaccianti has suffered and continues to suffer significant damages.

## V.     COUNT I – DECLARATORY JUDGMENT

178.    Procaccianti repeats and realleges the allegations of the preceding paragraphs.

179.    Procaccianti seeks a declaration of the parties' rights and duties under the Policy pursuant to 28 U.S.C. § 2201.  A justiciable controversy exists between Procaccianti and Zurich concerning the availability of coverage under the Policy for Procaccianti's claim.

180.    The controversy between Procaccianti and Zurich is ripe for judicial review.

181.    Rhode Island has adopted the Uniform Declaratory Judgment Act for purposes of declaring parties' right in this precise circumstance.

182.    Accordingly, Procaccianti seeks a declaration from the Court that:

(1)     Each coverage position identified herein is triggered by Procaccianti's claim;

(2)     No exclusion in the Policy bars or limits coverage, in whole or in part, for Procaccianti's claim;

(3)     The Policy covers Procaccianti's claim;

(4)     Zurich violated the implied covenant of good faith and fair dealing; and

(5)     Any other declaratory relief that would be useful to the resolution of the dispute between the parties.

## VI.     COUNT II – BREACH OF CONTRACT (PROPERTY COVERAGE)

183.    Procaccianti repeats and realleges the allegations of the preceding paragraphs.

184.    The Policy is a valid and enforceable contract between Procaccianti and Zurich.

185.    In the Policy, Zurich agreed to cover property against all risks of direct physical loss of or damage not otherwise excluded.

186.    COVID-19, the Pandemic and/or the Governmental Orders have caused and are continuing to cause physical loss and/or damage to Procaccianti's property.

34

187.     No exclusions bar or limit coverage.

188.     Procaccianti is entitled to coverage for the physical loss and/or damage from COVID-19, up to the Policy's $300 million limit of liability or any applicable sublimits.

189.     Procaccianti has complied with all applicable Policy provisions and has satisfied all conditions precedent to coverage under the Policy, including paying premiums and providing timely notice of the claim.

190.     To the extent Procaccianti has not complied with a condition in the Policy, it is because the condition does not apply or Zurich waived it.

191.     Nonetheless, Zurich unjustifiably refuses to pay for Procaccianti's losses in breach of the Policy.

192.     Procaccianti has suffered and continues to suffer damages as a result of Zurich's breach of the Policy.

193.     Procaccianti is entitled to damages as a result of Zurich's breach of contract in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## VII.   COUNT III – BREACH OF CONTRACT (TIME ELEMENT)

194.     Procaccianti repeats and realleges the allegations of the preceding paragraphs.

195.     The Policy is a valid and enforceable contract between Procaccianti and Zurich.

196.     In the Policy, Zurich agreed to cover Time Element loss, as provided in the Time Element Coverages, due to direct physical loss of or damage to Property of the type insurable under the Policy caused by a **Covered Cause of Loss** as provided in the Policy's Time Element Coverages.

197.    COVID-19 has caused and, upon information and belief, is continuing to cause physical loss and/or damage to Procaccianti's property and the property of others that has caused Procaccianti to suffer Time Element loss.

198.    No exclusions bar or limit coverage.

199.    Procaccianti is entitled to coverage for its Time Element loss related to COVID-19 up to the Policy's $300 million limit of liability or any applicable sublimits.

200.    Procaccianti has complied with all applicable Policy provisions and has satisfied all conditions precedent to coverage under the Policy, including paying premiums and providing timely notice of the claim.

201.    To the extent Procaccianti has not complied with a condition in the Policy, it is because the condition does not apply or Zurich waived it.

202.    Nonetheless, Zurich unjustifiably refuses to pay for Procaccianti's losses and expenses in breach of the Policy.

203.    Procaccianti has suffered and continues to suffer damages as a result of Zurich's breach of the Policy.

204.    Procaccianti is entitled to damages as a result of Zurich's breach of contract in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## VIII.   COUNT IV – BREACH OF CONTRACT (SPECIAL COVERAGES)

205.    Procaccianti repeats and realleges the allegations of the preceding paragraphs.

206.    The Policy is a valid and enforceable contract between Procaccianti and Zurich.

207.    In the Policy, Zurich agreed to afford coverage for Special Coverages as provided in the Policy's Special Coverages and Described Causes of Loss.

208.    COVID-19 has caused and is continuing to cause physical loss and/or damage to Procaccianti's property and the property of others that has caused Procaccianti to suffer Time Element loss covered under the Policy's Special Coverages and Described Causes of Loss.

209.    No exclusions bar or limit coverage.

210.    Procaccianti is entitled to coverage for its Time Element loss related to COVID-19 up to each Special Coverage's limit of liability or any applicable sublimits.

211.    Procaccianti has complied with all applicable Policy provisions and has satisfied all conditions precedent to coverage under the Policy, including paying premiums and providing timely notice of the claim.

212.    To the extent Procaccianti has not complied with a condition in the Policy, it is because the condition does not apply or Zurich waived it.

213.    Nonetheless, Zurich unjustifiably refuses to pay for Procaccianti's losses and expenses in breach of the Policy.

214.    Procaccianti has suffered and continues to suffer damages as a result of Zurich's breach of the Policy.

215.    Procaccianti is entitled to damages as a result of Zurich's breach of contract in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## IX.    COUNT V – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

216.    Procaccianti repeats and realleges the allegations of the preceding paragraphs.

217.    Zurich denied Procaccianti's claim for coverage under the Policy relating to its losses from COVID-19.

218.    Zurich has a duty to Procaccianti under the Policy's implied covenant of good faith and fair dealing.

219.    Zurich's denial of Procaccianti's claim lacks any reasonable basis.

220.    Zurich failed to conduct a reasonable investigation of Procaccianti's claim under the Policy and, therefore, Zurich's basis for its denial is unreasonable.

221.    Zurich acted maliciously, intentionally, fraudulently, or with gross negligence in its failure to conduct a reasonable investigation of Procaccianti's claim under the Policy.

222.    Zurich knew or was actually or implicitly aware of the lack of any reasonable basis to deny coverage.

223.    Zurich acted with reckless disregard as to the unreasonableness of its denial.

224.    Zurich breached its duty of good faith and fair dealing by failing to reasonably investigate Procaccianti's claim and provide coverage.

225.    Zurich's denial of coverage constitutes bad faith.

226.    As a result of Zurich's bad faith, Procaccianti has suffered and is continuing to suffer damages.

227.    Procaccianti is entitled to an award of damages because of Zurich's bad faith, in an amount to be determined at trial, including attorney's fees, pre- and post-judgment interest and any other costs and relief this Court deems appropriate.

## **PRAYER FOR RELIEF**

**Wherefore**, Procaccianti prays for judgment against Zurich as follows:

(1)    Procaccianti be awarded a judgment declaring that:

    (a)    Each of the coverage provisions identified herein is triggered by Procaccianti's claim;

    (b)    No exclusion applies to bar or limit coverage for Procaccianti's claim;

(c)     Zurich has breached the Policy by failing to pay Procaccianti's claim;

(d)     Zurich breached the implied covenant of good faith and fair dealing; and

(e)     Any other declaratory relief that would be useful to the resolution of this dispute between the parties;

(2)     Procaccianti be awarded its damages resulting from Zurich's breach of the Policy, including pre-judgment and post-judgment interest;

(3)     Procaccianti be awarded punitive and exemplary damages resulting from Zurich's breach of good faith and fair dealing;

(4)     Procaccianti be awarded special and consequential damages against Zurich in an amount to be proved at trial, in excess of $75,000.00;

(5)     Procaccianti be awarded an order enjoining Zurich's improper denial of benefits under the Policy;

(5)     Procaccianti be awarded its reasonable and necessary attorneys' fees and court costs;

(6)     Procaccianti be awarded such other and further relief, general or special, at law or in equity, to which it may be justly entitled.

## DEMAND FOR JURY TRIAL

Procaccianti demands trial by jury on all issues so triable.

12/08/2020

By:   */s/ Stephen M. Prignano*
Stephen M. Prignano (3649)
MCINTYRE TATE LLP
50 Park Row West, Suite 109
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (fax)
sprignano@mcintyretate.com

Michael S. Levine*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037-1701

*[Additional Counsel on Following Page]*

Michael L. Huggins[*]
HUNTON ANDREWS KURTH LLP
50 California Street, Suite 1700
San Francisco, California 94111

Christopher M. Pardo[*]
Katharine A. Dennis[*]
HUNTON ANDREWS KURTH LLP
60 State Street
Boston, MA 02109

*Attorneys for Plaintiffs,
Procaccianti Companies, Inc. and
TPG Resorts & Hotels, Inc.*

[*]*(pro hac vice applications
forthcoming)*